# 2006 DTA 121

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**

CASCO SALES COMPANY
Demandante-Apelante

v.

LUIS RIVERO CUBANO Y OTROS
Demandados-Apelados

Núm. KLAN-2006-00439

San Juan, Puerto Rico, a 6 de octubre de 2006

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
el Juez López Feliciano y la Juez García García

García García, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

CASCO Sales Company, Inc. (en adelante CASCO) acude ante este Tribunal mediante recurso de apelación para solicitarnos que revisemos la Sentencia emitida por el Tribunal de Primera Instancia (en adelante T.P.I.) el 8 de febrero de 2006, notificada de su archivo en autos el 13 del mismo mes y año. En dicha Sentencia, el T.P.I. acogió los planteamientos esbozados por el Sr. Salvador Ramírez Cardona, Administrador de la Administración de Servicio y Desarrollo Agropecuario (en adelante la ASDA) en su solicitud de sentencia sumaria.

· Con el beneficio de la comparecencia de las partes y el derecho aplicable, procedemos a resolver las controversias ante nuestra consideración.

### I

Como consecuencia de las inundaciones provocadas por las lluvias acontecidas en noviembre de 2003, la ASDA se enfrentó a cientos de solicitudes de agricultores que interesaban que se les limpiaran sus terrenos. Ello junto con el atraso que tenían en el cumplimiento de solicitudes previas, la ASDA el 13 de diciembre de 2003 solicitó con urgencia que se le permitiera realizar una compra de emergencia de doce (12) máquinas *"bulldozer"* para el programa de mecanización agrícola. Ese mismo día, el anterior Secretario de Agricultura, Luis Rivero Cubano (en adelante Secretario), le dio su visto bueno.

Rápidamente, entre el 23 y 24 de diciembre, la ASDA emitió una requisición para la compra de equipos y/o materiales o servicios número AS-CM-95, en la que requería cotizaciones para las máquinas *"bulldozer"* de 110-125 HP. En esta misma fecha, el Sr. José Burgos Ortiz, Jefe de Presupuesto y Planificación de la ASDA, certificó la existencia de fondos disponibles para la compra de la maquinaria objeto de la requisición.

A principios de enero del año siguiente, el Sr. Pablo E. Valdivieso, Oficial Ejecutivo de Compras, remitió a las empresas de distribución y venta de equipo de construcción industrial y agrícola, R & B Power, Inc., RIMCO, Inc., AMECO y CASCO, la invitación para cotizar. El 9 de enero de 2004 se emitió un segundo aviso de invitación para cotizar. En torno al referido aviso, plantea CASCO que una vez lo recibió procedió a

comunicarse con el Sr. Pablo E. Valdivieso para inquirir sobre la naturaleza y el propósito de la invitación, quien le indicó que se trataba de una subasta de emergencia. Finalmente, el 13 de enero se emitió el tercer aviso de invitación para cotizar, advirtiendo que la fecha límite era el 14 de enero 2004 y que las ofertas se abrirían el 15 de enero de 2004.

El 15 de enero de 2004, los encargados de la subasta en controversia procedieron a abrir las ofertas. Conforme a CASCO, la oferta de RIMCO no cumplía con los requisitos dispuestos por la ASDA, ya que la cotización era por otro tipo de maquinaria de 90 HP. El Director Ejecutivo de Compras procedió a enviarle al Administrador, Sr. Salvador Ramírez Cardona (en adelante Administrador), un memorando que explicaba las tres cotizaciones y solicitaba se nombrara el comité que analizaría las ofertas.

El 22 de enero de 2004, el Administrador delegó en el Sub-administrador la encomienda de la evaluación de las cotizaciones y la recomendación. Días después, el Sub-Administrador emitió un comunicado, en el que recomendó que se comprara el equipo a RIMCO. El Administrador aceptó la recomendación condicionado a que previo a emitir una decisión final se le solicitara a los demás postores que cotizaran nuevamente, pero en esta ocasión para las máquinas de 90 HP. En cumplimiento con dicha orden, la ASDA solicitó a CASCO y a R & B Power que presentaran cotizaciones por máquinas de 90 HP e incluyó dentro de los requisitos que el tiempo de entrega debería ser de no más de sesenta (60) días.

Indica CASCO que el 30 de enero de 2004 se comunicó con la ASDA. El Sr. Aristóteles Picorelli, su Representante de Ventas, conversó con el Sr. Pablo E. Valdivieso para solicitarle información sobre la segunda solicitud de cotizaciones.

Además, en esa misma fecha tanto R & B Power como CASCO presentaron sus cotizaciones. Señala CASCO que ni RIMCO ni R & B Power, Inc. variaron su oferta de entrega. Por su parte, CASCO propuso la entrega en un período de 45 a 60 días después de ordenada.

El 26 de febrero de 2004, CASCO, mediante carta entregada personalmente al Sr. Pablo E. Valdivieso, expresó su inconformidad con el proceso y solicitó la revisión del expediente y que se le indicara el resultado del proceso de subasta. Alega CASCO que al momento de la entrega de la referida carta cuestionó el resultado de la subasta y se le indicó que no se le podía decir hasta que se notificara formalmente.

Dos semanas después, CASCO envió otro comunicado a la ASDA reiterando lo solicitado en su carta del 26 de febrero. El 5 de marzo de 2004, CASCO recibió contestación de la Lcda. Nilda López Hidalgo, Ayudante Especial de Asuntos Legales de la ASDA, en la cual se indicó que el expediente estaba disponible para su inspección. El 9 de marzo CASCO procedió a inspeccionar el expediente y a petición suya se le produjo copia certificada de éste.

Sostiene CASCO que de dicha inspección surgió que el 2 de febrero de 2004 la ASDA había emitido una Orden de Compra de $834,600.00 por la maquinaria "*bulldozer*" de 90 HP a la empresa RIMCO. En definitiva, la subasta había sido adjudicada a RIMCO, mas dicha determinación no había sido notificada.

Según indica CASCO, no estaba de acuerdo con dicha adjudicación. Ahora bien, la primera vez que cuestionó la decisión fue el 11 de mayo de 2004, dos (2) meses después de haberse enterado de la adjudicación, cuando le requirió directamente al Secretario de la ASDA, a la administración y los oficiales de compra involucrados en la subasta que cumplieran con su deber ministerial de cumplir con las leyes, reglamentos y decisiones judiciales que regulan los procesos de compra en el Departamento de Agricultura y sus unidades institucionales. No surge del expediente la contestación que dio la ASDA a esta misiva.

Seguido, el 20 de mayo de 2004, CASCO presentó un Recurso de *Mandamus*, KLRX-2004-00021,

directamente ante este Tribunal de Apelaciones para que se ordenara al Secretario y demás directores y empleados de la ASDA que cumplieran con su deber de realizar conforme a la ley y a los reglamentos la adjudicación de subastas. Días más tarde, este Foro declinó asumir jurisdicción y remitió el caso al T.P.I. por considerar que existían controversias de hechos que eran necesarias dirimir en instancia.

El 11 de octubre de 2004, CASCO presentó solicitud de demanda enmendada en contra de la ASDA. Surge del expediente que durante el transcurso de los procedimientos judiciales, CASCO realizó descubrimiento de prueba mientras que la ASDA únicamente solicitó Moción de Desestimación amparándose en el expediente administrativo. Igualmente, el Secretario de la ASDA y el Administrador demandado, en su carácter personal, presentaron Moción de Sentencia Sumaria. CASCO replicó las mociones y, a su vez, presentó su Moción de Sentencia Sumaria.

Cabe destacar que ninguna de las partes solicitó vista para presentar prueba testifical. Únicamente se celebró vista para argumentar las mociones de desestimación y de sentencia sumaria. Luego de examinadas las mociones ante su consideración, el T.P.I. emitió la Sentencia aquí impugnada. Determinó que la prueba documental anejada a la Moción de Sentencia Sumaria presentada por el Administrador de la ASDA es la que establece los hechos esenciales necesarios para la adjudicación del caso, porque ella estableció que: no había disputa sobre cuándo comenzaron y terminaron las lluvias, el efecto desastroso en el sector agrícola en el país, sobre cuándo comenzó y terminó el procedimiento de compra de emergencia, ni tampoco sobre cuáles empresas ofrecieron sus máquinas, sus precios y características. Determinó que las porciones de las deposiciones tomadas y presentadas por CASCO no cambiaron el cuadro básico de los hechos esenciales, ya que eran opiniones de algunos funcionarios de la ASDA emitidas con posterioridad a los hechos.

También, en la Sentencia se estableció que existe otro procedimiento judicial relacionado a la Subasta SC-34-005, iniciado en el año 2003, cuya requisición era por las mismas máquinas de la subasta de emergencia. No obstante, al paralizarse la referida subasta el 21 de noviembre de 2003 y ante la necesidad de máquinas *"bulldozer"* para cumplir con los pedidos, la ASDA procedió a realizar una subasta de emergencia. Aun cuando en septiembre de 2004 el T.P.I. concluyó la controversia sobre la subasta antes citada, SC-34-005, en el foro administrativo se continuó la tramitación de la impugnación de la referida subasta por CASCO. Es menester destacar que el T.P.I. indicó que hasta el día de la vista de argumentación el procedimiento administrativo de dicha subasta no había finalizado.

Respecto a la carta que envió CASCO a la ADSA el 30 de enero de 2004, el foro apelado indicó que la cotización del equipo de emergencia era independiente al de la subasta impugnada, SC-34-005. Además, que durante el proceso de cotización de la subasta de emergencia, CASCO nunca cuestionó la legalidad del proceso. Que no es hasta cerca de dos meses y medio (2½) después de haber revisado el expediente de la subasta que CASCO, por primera vez, impugna la legalidad de la subasta en una carta dirigida a la ASDA. Semanas más tarde es cuando CASCO acude ante el Tribunal mediante Recurso de *Mandamus*.

Por último, el T.P.I. determinó que la situación de emergencia que provocó la compra de las maquinas duró un período de varios meses porque la burocracia gubernamental no provee la rapidez que se espera en un caso de esta magnitud. Por ello, el atraso en la entrega de las máquinas no es un vicio de ilegalidad del procedimiento, sino que es causa para que la ASDA le reclame al suplidor cualquier indemnización a que tuviere derecho contractualmente.

Inconforme con la determinación del T.P.I., CASCO oportunamente acude ante nos para plantearnos que:

*"ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL IGNORAR LOS RECONOCIDOS CRITERIOS QUE REGULAN LOS PROCESOS DE COMPRA EN LAS AGENCIAS GUBERNAMENTALES;*

*ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL IGNORAR LOS HECHOS INCONTROVERTIDOS QUE SURGÍAN DE LA ÚNICA PRUEBA QUE TUVO ANTE SU CONSIDERACIÓN, AQUELLA PRUEBA DOCUMENTAL PRESENTADA Y LAS DEPOSICIONES TRANSCRITAS, Y*

*ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL IMPARTIRLE VALIDEZ A UNA ACTUACIÓN GUBERNAMENTAL QUE ES NULA, NO ANULABLE."*

Por su parte, el 2 de mayo de 2006, el Administrador de la ASDA compareció mediante escrito de oposición. En su escrito destacó la tardanza de CASCO en impugnar la legalidad de la subasta y que esta última nunca ha citado específicamente el texto de las secciones o artículos de las leyes y reglamentos que alegadamente fueron infringidos.

También compareció el Procurador General del Estado Libre Asociado de Puerto Rico para indicarnos que CASCO participó plenamente en todo el procedimiento de compra de emergencia sin denunciar en momento alguno la ilegalidad del mismo; que el proceso de compra de emergencia comenzó el 8 de diciembre de 2003 y se condujo con rapidez tomando en cuenta el cuidado que debe tenerse al adquirir 12 unidades de equipo pesado; y finalmente, que la Ley Orgánica de la Administración de Fomento Agrícola, cuyas funciones ahora implementa la ASDA, contiene un estatuto que permite la compra de emergencia sin celebrar una subasta, la cual se podrá realizar en el mercado abierto y deberá justificarse por escrito y ser aprobada por el Director de la ASDA.

Resumidos los hechos y los argumentos de las partes comparecientes, procedemos a discutir el derecho aplicable.

II

A. Administración de Servicios y Desarrollo Agropecuario

El Artículo 1 del Plan de Reorganización Núm. 1 del 4 de mayo de 1994 declaró como política pública que *"[a] los fines de lograr la consecución de los objetivos señalados, este Plan propone reorganizar el Departamento de Agricultura estableciendo los componentes operacionales y programáticos enmarcados en una política donde el agricultor constituya el eje principal y el sector agropecuario alcance un óptimo y marcado desarrollo. Se propone crear la Administración de Servicios y Desarrollo Agropecuario de Puerto Rico y transferir a esta estructura las facultades, poderes y funciones legales de la Administración de Servicios Agrícolas y la Administración de Fomento Agrícola".* 3 L.P.R.A. Ap. V, Art. I.

En virtud del Art. IV del referido plan de reorganización se creó la ASDA; aunque adscrita al Departamento de Agricultura, ésta funcionaría como una entidad jurídica separada del Estado Libre Asociado de Puerto Rico y sus agencias e instrumentalidades. 3 L.P.R.A. Ap. V, Art. IV; *Ghigliotti Arzola v. Administración de Servicios Agrícolas*, 149 D.P.R. 902 (1999).

Por medio del Artículo V se transfirió a la ADSA todas las facultades, poderes y funciones legales de la Administración de Servicios Agrícolas y las de Fomento Agrícola. Entre los poderes delegados está la capacidad de celebrar subastas para la compra de equipos, bienes y servicios.

B. Subasta

El procedimiento de pública subasta es de suma importancia y está revestido del más alto interés público. *Empresas Toledo, Inc. v. Junta de Revisión,* Opinión del 31 de agosto de 2006, **2006 J.T.S. 147**; *Oliveras, Inc. v. Universal Insurance Co.,* 141 D.P.R. 900 (1996). En materia de adjudicación de subastas, el Tribunal

Supremo ha expresado que *"[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como un comprador con eficiencia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa."* Empresas *Toledo, Inc. v. Junta de Revisión, supra; A.E.E. v. Maxón Engineering Services, Inc.,* Opinión del 9 de diciembre de 2004, **2004 J.T.S. 199**; *RBR Const., S.E. v. A.C.,* 149 D.P.R. 836 (1999); *Oliveras, Inc. v. Universal Insurance Co., supra; Hatton v. Mun. de Ponce,* 134 D.P.R. 1001 (1994); *Mar-Mol Co. Inc. v. Adm. Servicios Gens.,* 126 D.P.R. 864 (1990).

El objetivo fundamental de las subastas es, precisamente, proteger al erario mediante la construcción de obras públicas y la adquisición de servicios de calidad para el Gobierno al mejor precio posible. Para ello, es necesario que haya competencia en las proposiciones, fomentando la competencia libre y transparente entre el mayor número de licitadores posibles de manera que el Estado consiga que se realice la obra al precio más bajo posible. *Empresas Toledo, Inc. v. Junta de Revisión, supra; RBR Const., S.E. v. A.C., supra; Cancel v. Mun. de San Juan,* 101 D.P.R. 296 (1973).

El Reglamento General de Compras y Subastas del Departamento de Agricultura y sus Unidades Institucionales, Reglamento Número 6632 (en adelante Reglamento 6632), está vigente desde el 10 de junio de 2003. Con éste se derogó el Reglamento Número 5389 del 27 de febrero de 1996.

Respecto a los participantes de una subasta, el Artículo 6 del referido reglamento dispone que los licitadores en una subasta deberán ser los que estén inscritos en el Registro de Licitadores del Estado Libre Asociado de Puerto Rico. De otra parte, los adjudicadores de las subastas será la Junta de Subastas. Ésta, conforme al Artículo 11, tendrá como función:

*"a. Examinar toda la documentación sometida para llevar a cabo el proceso de subasta. Decidir todo lo relacionado con las condiciones y la adjudicación de las subastas para que se efectúen de conformidad con los más altos niveles de calidad, economía y eficiencia, y en cumplimiento con las normas vigentes.*

*b. Decidir sobre asuntos relacionados con subastas informales y otros que le sean sometidos a su atención por el Secretario y Oficial Ejecutivo de Compras.*

*c. Atender y tomar decisiones sobre impugnaciones de pliegos de subastas formales.*

*d. Nombrar a los integrantes de los comités técnicos que estimen necesarios para crear para asesorarle en la adjudicación de las subastas formales y otros asuntos referidos a su atención.*

*e. ...*

*f. ...*

*g. ...*

*h. ...*

*i. ...*

*j. ...*

*k. ...*

*l. Adjudicación: Las decisiones tomadas por la Junta sobre cada subasta, una vez adoptadas, deberán constar en un documento escrito que incluirá, pero no limitándose a Minutas de las Reuniones, Acta de Adjudicación, Aviso de Adjudicación, entre otros.*

*m. ... ".*

En torno al procedimiento en sí, el reglamento especifica el modo en que se realizarán dependiendo de la clasificación que se le otorgue, entiéndase informal o formal. La subasta informal procederá cuando la adquisición de equipo o servicios no profesionales no exceda la cantidad de cuarenta mil dólares ($40,000.00) para Programas de Servicios y quince mil dólares ($15,000.00) para Programas Administrativos. Las formales se llevaran a cabo cuando la adquisición de bienes, equipos, materiales o servicios excedan la cantidad de cuarenta mil ($40,000.00). Art. 15 del Reglamento 6632.

Conforme al reglamento antes citado, no será necesario celebrar subastas en situaciones de emergencia. Las razones o circunstancias para la celebración de dicha subasta de emergencia deberán constar por escrito y ser aprobada por el Secretario del Departamento o su representante autorizado. Bajo ningún concepto podrá considerarse como emergencia aquellas situaciones que no sean de carácter urgente o imprevistas, ni aquellas en las que debieron seguirse los trámites ordinario de compra conforme a las disposiciones del reglamento. Art. 48 del Reglamento 6632.

Además de lo antes citado, es menester discutir la impugnación de una subasta. Conforme al reglamento, una subasta se podrá impugnar en dos instancias. Primero, puede objetarse en el momento en que se notifica el pliego de la subasta. Establece el Artículo 28 que un licitador o parte con interés en participar de la subasta podrá solicitar por escrito la impugnación del pliego si no estuviera de acuerdo con los términos y condiciones de ella.

Ahora, si lo que se desea impugnar es la adjudicación, cualquier licitador adversamente afectado por el resultado de la subasta, podrá dentro del término de diez (10) días contados a partir de la fecha de envío de la notificación según consta en matasello o de la decisión de la Junta de Subastas resolviendo, instar una apelación ante la Junta de Apelaciones del Departamento de Agricultura. Art. 51 del Reglamento 6632. La referida apelación deberá estar acompañada de una fianza del veinticinco por ciento (25%) del valor de las partidas impugnadas. Una vez resuelta la apelación, de estar inconforme con la determinación, se podrá acudir ante este Tribunal mediante un recurso de revisión dentro del término de diez (10) días a partir del archivo en autos de copia de la notificación de la Resolución. Art. 59 del Reglamento 6632.

## C. Incuria

En reiteradas ocasiones, nuestro Tribunal Supremo ha indicado que se entiende por incuria o laches, la *"dejadez o negligencia en el reclamo de un derecho, la cual en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad".* *Pérez Guzmán v. Rosselló González,* Opinión del 14 de julio de 2004, **2004 J.T.S. 111**; *IM Winner, Inc. v. Mun. de Guayanilla,* 151 D.P.R. 30 (2000); *Colón Torres v. A.A.A.,* 143 D.P.R. 119, 124 (1997); *Pueblo v. Valentín,* 135 D.P.R. 245, 255-256 (1994); *Aponte v. Srio. de Hacienda,* 125 D.P.R. 610 (1990).

En *Pueblo v. Valentín,* 135 D.P.R. 245 (1994), citando con aprobación lo dispuesto en *Torres Arzola v. Policía de Puerto Rico,* 117 D.P.R. 204, 209 (1986), establecimos que:

*"... no basta el transcurso de un tiempo determinado para que exista lo que se denomina técnicamente incuria o laches. **Es imprescindible que la conducta negligente del peticionario, al no promover con prontitud y diligencia la expedición del auto, haya causado una demora innecesaria e indebida que de hecho perjudica***

*a las demás personas interesadas. **Adviértase que la teoría de laches envuelve dos elementos: (1) la dilación injustificada en la presentación del recurso; y (2) el perjuicio que ello pueda ocasionar a otras personas, según las circunstancias.** Además, hay que considerar el efecto que tendría la concesión o la denegación del auto sobre los intereses privados y sociales en presencia. Cuando la demora no perjudica a nadie o el perjuicio causado es leve, si se le compara con el daño que sufriría el peticionario o el público en caso de no librarse el auto, el lapso de tiempo transcurrido tiene que ser grande para que exista la incuria equitativa. En cambio, aunque la dilación sea relativamente corta, si resulta en detrimento para el interés público o los derechos individuales del acusado, procede denegar el auto a base de la doctrina de laches. **Sobre todo[,] es preciso tener en cuenta los méritos y demás circunstancias del caso específico, ya que la doctrina de incuria sigue vinculada a la idea fundamental de la equidad: se acude a la "razón" y a la "conciencia" para encontrar soluciones justas, apartándose del rigorismo intransigente de los términos fatales. "* (Énfasis suplido)

## III

La controversia del presente caso gira en torno a la legalidad de la celebración de una subasta de emergencia por parte de la ASDA. Al estar íntimamente relacionados los tres (3) planteamientos de error, procederemos a discutirlos en conjunto.

Como ya mencionáramos, este caso versa sobre la impugnación de una subasta por CASCO, quien no siguió el proceso tradicional en el que se acude primero a la Junta de Apelaciones de Subastas que atiende los casos de la ASDA, sino que tres (3) meses después de haberse enterado de la decisión de la adjudicación acudió directamente a este Tribunal mediante un recurso extraordinario de *Mandamus*, para que se le ordenara tanto al Secretario de la ASDA como a su Administrador cumplir con las leyes y reglamentos que la obligan. Este Tribunal decidió no asumir jurisdicción y enviar el caso al T.P.I. para que allí se dirimieran las controversias sobre si procedía o no realizar la compra de emergencia. Una vez devuelto el caso al T.P.I., CASCO procedió a someter sus alegaciones en torno a la supuesta ilegalidad de la subasta de emergencia adjudicada a favor de RIMCO, Inc.

Antes de proseguir con la discusión, consideramos importante puntualizar que debido a que bastante tiempo antes a la celebración de la subasta en controversia se había iniciado un proceso de impugnación de otra subasta que, también, pretendía la compra de varios equipos *"bulldozer"*, ello propició una confusión entre ambas subastas y que, en consecuencia, se nos planteara que la ASDA utilizó la referida subasta de emergencia como subterfugio a la paralización de la compra en el otro procedimiento de impugnación. A dicho planteamiento debemos indicar que ambos procedimientos son distintos el uno del otro y que, además, la maquinaria de *"bulldozer"* es un equipo comúnmente utilizado por la ASDA para el ofrecimiento de sus servicios, por lo que es lógico pensar que tienen una necesidad continua de adquirir nuevos modelos.

Aclarado dicho punto, continuamos con la discusión de los demás argumentos de CASCO. Ésta nos plantea que no existía una emergencia real al momento de la subasta, puesto que de lo contrario la ASDA no se hubiese tardado tanto en adjudicarla y en esperar por la entrega del equipo comprado. El T.P.I. en la Sentencia impugnada justificó la referida tardanza en la adquisición de la maquinaria expresando que el problema es la burocracia en el sistema. Indicó el T.P.I. que:

*"...en un mundo ideal de burocracias gubernamentales súper rápidas y eficientes quizás la compra de emergencia de marras se hubiese iniciado oficialmente al otro día de terminadas las lluvias. Pero es que esa no es la realidad de la operación de ninguna administración gubernamental en Puerto Rico, en ningún momento de su historia moderna, bajo ninguna administración política. Es en ese contexto real de nuestra sociedad que han de examinarse los hechos esenciales ya antes establecidos. "*

Consideramos que las expresiones del foro apelado no son arbitrarias ni caprichosas. Definitivamente, el tiempo en que una agencia o su instrumentalidad puede autorizar, realizar y adjudicar una subasta mediante el

procedimiento ordinario es de muchos meses. En este caso, se inició el proceso de compra una vez la Gobernadora de Puerto Rico decretó el estado de emergencia y luego de que la ASDA se percatara de que no daba abasto para cumplir con todas las solicitudes de limpieza de terrenos presentadas. Aun con la pequeña tardanza por la espera de la maquinaria, el tiempo de espera de los agricultores fue mucho menor al ordinariamente esperado.

De otra parte, sostiene CASCO que el foro apelado erró al ignorar hechos incontrovertidos que surgían de la prueba documental desfilada ante el foro apelado. Sabido es que la apreciación de la prueba realizada por el tribunal sentenciador merece deferencia y que no deben intervenir los tribunales apelativos con ésta en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio o parcialidad, o que cometió un error manifiesto. *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721, 728 (1984). El fundamento de esta deferencia hacia el tribunal de instancia es que **el juez inferior tuvo la oportunidad de observar toda la prueba presentada y, por lo tanto, se encuentra en mejor situación que el tribunal apelativo para considerarla.** (Énfasis nuestro). *Sepúlveda v. Departamento de Salud,* 145 D.P.R. 560 (1998); *Mercado Puilichini v. U.C.P.R.,* 143 D.P.R. 610 (1997); *Monllor v. Soc. de Gananciales,* 138 D.P.R. 600 (1995); *Cruz v. Hosp. La Concepción, supra.*

No se desprende del expediente ante nuestra consideración que en el caso de autos el foro apelado cometiera error manifiesto o que hubiese pasión, prejuicio o parcialidad al momento de adjudicar. El T.P.I. señaló que la prueba sometida para su consideración, entre ella los extractos de deposiciones sometidos por CASCO, no varió el cuadro básico de los hechos esenciales, ya que se trataba en su mayoría de opiniones o puntos de vista *a posteriori* de algunos funcionarios sobre cuándo y cómo se hacen las compras de emergencia en el Departamento de Agricultura. Fundamentó dicha aseveración en que de la totalidad del récord oficial de la referida subasta de emergencia surgió claramente la manera en que se llevó a cabo el procedimiento. En el presente caso CASCO no rebatió las determinaciones del T.P.I. ni puso a este Tribunal en posición de afirmar que se cometió un error en la apreciación de la prueba.

Además, surge del expediente que la anterior Gobernadora de Puerto Rico, Sila María Calderón, decretó un estado de emergencia en las zonas más afectadas por las lluvias de noviembre de 2003. Ello junto con el Artículo 48 del Reglamento 6632, el cual indica que no será necesario celebrar subastas en situaciones de emergencia, indujo a que el T.P.I. entendiera que en efecto existía una verdadera emergencia que ameritaba se tomara acción por parte de las agencias e instrumentalidades gubernamentales.

Finalmente, arguye CASCO que el T.P.I. no debió haberle impartido validez a una actuación gubernamental que es nula y no anulable, ello porque la requisición de la subasta omitió señalar el costo estimado y la disponibilidad de fondos, y porque la orden de compra emitida fue por un equipo distinto al indicado en la primera requisición de la subasta.

Ahora bien, CASCO se limitó a mencionar lo antes indicado, mas no fundamentó en derecho su alegación de nulidad. Meramente indica al final de su escrito que *"[b]asta un sencillo conocimiento de las normas de compra aplicables para darse cuenta que el proceso de compra realizado en este caso es nulo e ineficaz".*

El Artículo 16 del Reglamento 6632 provee que la requisición de la subasta contendrá: la descripción de lo que se interesa adquirir; las especificaciones recomendadas; las especificaciones sobre modelo, marca y otras especificaciones; las condiciones particulares de la solicitud; la justificación sobre la necesidad del Departamento o sus unidades institucionales; su uso o destino; y la certificación de los Fondos con que se pagará la compra.

La Sentencia emitida por el T.P.I. contiene una amplia discusión del referido reglamento. Luego del análisis del derecho aplicable concluyó que de *"una simple hojeada a la Requisición de Compra incluida en los documentos incontrovertidos establece que la misma, en su última página, tiene la certificación de "Fondos Disponibles" marcada afirmativamente bajo la firma del Jefe de Presupuesto y Planificación... Eso es lo único*

*que requiere la reglamentación... No existe requerimiento estatutario o reglamentario alguno para que se especifique "el costo estimado".* Y respecto al cambio en las especificaciones de las máquinas objeto de la subasta, el T.P.I. también determinó que no existe disposición que prohíba la variación de las especificaciones durante el procedimiento de subasta de energía.

Primeramente, como ya indicáramos en la relación de hechos, el 24 de diciembre de 2003, el Sr. José Burgos Ortiz, Jefe de Presupuesto y Planificación de la ASDA, certificó la existencia de fondos disponibles para la compra de la maquinaria objeto de la requisición. Según se desprende del Reglamento 6632, la inclusión en la requisición de dicha certificación es suficiente, mas no exige la necesidad de que se incluya en la requisición de subasta el costo estimado.

En torno a la variación de las especificaciones de la maquinaria en la subasta, consideramos que ello no le causó ningún perjuicio a CASCO. Del expediente surge que en este caso, distinto a las veces en que la en resolución final de adjudicación de la subasta por primera vez se indicó un cambio en las especificaciones de la requisición original, la ASDA le informó a todos los licitadores sobre la variación en la descripción de la maquinaria y, además, se les brindó una oportunidad adicional para que sometieran una nueva oferta que cumpliera con las nuevas especificaciones sobre las máquinas *"bulldozer"*. Está claro que CASCO se benefició de esta segunda oportunidad, ya que sometió una nueva oferta, pero que no fue seleccionada por no haber sido la más económica.

Antes de culminar, queremos puntualizar que tanto la L.P.A.U. como el reglamento aplicable especifican que una parte afectada por la adjudicación de una subasta tendrá diez (10) días, contados a partir de la fecha de notificación, para impugnarla. En el caso de autos, aún partiendo de la premisa de que no se notificó la adjudicación final, CASCO se tardó demasiado en presentar su reclamación, puesto que una vez advino en conocimiento de la determinación tardó dos (2) meses en presentar su acción. Su tardanza denota dejadez de su parte.

En virtud de lo anteriormente expresado, resolvemos que no se cometió ninguno de los errores planteados por CASCO. Como ya mencionáramos, el juez del foro apelado tuvo la oportunidad de evaluar toda la prueba presentada. No encontramos evidencia que demuestre que el foro apelado decidió bajo prejuicio, parcialidad o que cometiera error manifiesto.

**IV**

Por los fundamentos anteriormente expuestos, confirmamos la Sentencia impugnada.

Lo acordó el Tribunal y certifica la Secretaria Interina del Tribunal de Apelaciones.

Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones